In re Elizabeth McCREERY, Debtor.

**KEYBANK fka Society National Bank, Plaintiff,**

**v.**

**Elizabeth McCREERY, Defendant.**

**Bankruptcy No. 96–51988.**
**Adversary No. 96–5172.**

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

Sept. 30, 1997.

David Friedman, Akron, OH, for Plaintiff.

Edward Weber, Akron, OH, for Defendant.

## OPINION

MARILYN SHEA-STONUM, Bankruptcy Judge.

This matter is before the Court after the trial on the complaint of Keybank to determine the dischargeability of a debt. Appearing at the trial were David Friedman, counsel for the Plaintiff, and Edward Weber, counsel for the Defendant. The Court heard the testimony of Elizabeth McCreery. This Court considered her testimony and the exhibits admitted during the trial in reaching its decision.

## I. JURISDICTION

This matter involves the application of 11 U.S.C. § 523(a)(2)(A) dischargeability criteria to certain credit card debt. Resolution of this matter is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I). This Court has jurisdiction to enter a final order in this matter pursuant to 28 U.S.C. § 157(a) and (b)(1) and the Standing Order of Reference entered in this District on July 16, 1984.

## II. ISSUE PRESENTED

At issue here is whether the charges and cash advances on the debtor's account with Keybank fka Society National Bank incurred during the period 45 days to 20 days prior to her filing should be determined to be nondischargeable under 11 U.S.C. § 523(a)(2)(A). The parties stipulated that (1) the balance due on the subject account as of July 12, 1996 was $1,198.05 and as of August 12, 1996 was $8,199.16; (2) none of the charges made to the debtor's account were for luxury goods; and (3) the debtor never exceeded her credit limit on the credit card issued by the plaintiff. In addition, at no time in the case has the plaintiff suggested that the debtor misrepresented any matter in establishing her credit relationship with plaintiff; indeed the record is silent on when and how the subject account was established. In essence, the plaintiff seeks a determination that the debtor's course of conduct during the 25 day period in question be found to be a "false pretense, a false representation, or actual fraud."

## III. FINDINGS OF FACT

There was little dispute as to the factual record developed at trial.

On August 27, 1996, Elizabeth McCreery filed a petition for relief under Chapter 7 of the Bankruptcy Code. Two or three months

prior the date she filed a petition for relief, her husband, Larry McCreery, moved out of their rented home where they had been living with Ms. McCreery's twenty year old son. After Mr. McCreery moved out, the debtor and her son stayed in the rented home. In July, 1996, Elizabeth and Larry McCreery's divorce became final.

The debtor, Ms. McCreery, works as a cashier at DIY Warehouse and earns $6.35 per hour before taxes.[1] She works approximately 38 hours per week. Since August, 1996, her only source of income has been from her full time job at DIY.[2] The debtor testified that prior to their divorce, Mr. McCreery, who was receiving money from social security disability and a veteran's pension, contributed very little if anything to the household expenses. According to the debtor's schedule I[3] her income is $881.00 per month. In contrast, according to the debtor's schedule J, her monthly expenses total $1,538.95.

The debtor had been granted 17 separate lines of credit on which she could draw through 17 separate credit cards, including her Keybank card. As of the date of her bankruptcy filing, the balances on those accounts totaled over $65,000.00. With the exception of the Keybank charges from July to August 1996, the record is silent on when those debts were incurred. The debtor testified that she allowed her son and her daughter to use her credit cards. She had an agreement with her daughter whereby the daughter would pay back what she could. She did not have a similar arrangement with her unemployed son who lives with her. The debtor testified that during the summer of 1996 she used cash advances obtained from her Keybank account to make minimum payments on some of the other 16 cards.

In addition, the debtor's father helped her financially. However, the debtor could not recall how much money her father gave her per month.[4] The debtor expected to receive financial help from her ex-husband as well, but that financial help never materialized. The debtor testified that she expected to be able to pay her credit card bills with her father's help. By mid-summer 1996, the debtor was using one credit card to pay the minimum balance on the other credit cards and to pay other bills as they came due. The debtor believed she could continue this cycle of taking cash advances on one card to keep her other 16 cards current without consequence.[5]

Exhibit 8 shows several cash advances during the one month period at issue here. Counsel for the plaintiff asked the debtor about each cash advance. The debtor said she used the cash advances (in the sum of approximately $4,810 between July 11 and August 5, 1997) to pay other bills, credit cards, living expenses and utilities as they became due.

After her separation from her husband, another of the debtor's 17 credit card accounts became delinquent. According to the debtor's testimony, she had not been using the card. She had lent that card to someone who did not pay the account bills as they came due.[6] Once that account was delinquent, that credit card company began making what the debtor characterized as harass-

---

1. The testimony was unclear on precisely how long Ms. McCreery has worked at DIY. However, she did testify that she has been earning $6.35 per hour for the past year and prior to that $6.00 per hour from the same employer.

2. The debtor testified that DIY usually gives only 38 hours of work per employee each week.

3. The debtor testified as to the amount of her monthly income and expenses at the time of filing as reflected on her schedules I and J.

4. There is no evidence as to when her father began helping the debtor financially, nor if or when he stopped.

5. Exhibit 1, to which the parties stipulated, reads in part, "Good News! Because we appreciate your business, we are offering you the option of skipping your payment. That's correct—no payment is due on your account this month! Thank you for using your credit card!(normal finance charges will continue to accrue on any unpaid balance)." The debtor understood this to mean that she could skip her required payment without consequence.

6. The Court's record contains no further information regarding the identity of this person or that person's relationship to the debtor. The debtor testified that this person was using her card to buy lumber and supplies.

ing phone calls to her. These calls prompted the debtor to speak with an attorney. In the middle of August, 1996, the debtor first met with her attorney and discussed the option of bankruptcy. The debtor testified that she had never contemplated filing for bankruptcy prior to that meeting in mid-August with her attorney.[7]

The evidence does not indicate when the debtor obtained her credit card from the plaintiff[8], nor does it indicate the amount of her initial credit limit, although Exhibits 1–8 indicate that the debtor had a credit limit of $8,000.00 at least since February, 1996. The evidence does not reveal what steps, if any, the plaintiff took in determining whether to provide Ms. McCreery with an $8,000.00 credit limit. Finally, the evidence does not address the debtor's credit card use or payment history prior to the 1996 billing year.

IV. LAW

■ The plaintiff alleges that the debtor's credit card debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), which provides,

> A discharge ... does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

Generally, the five elements to a claim under 11 U.S.C. § 523(a)(2)(A) are: "(1) the debtor made representations, (2) the debtor knew such representations to be false at the time they were made, (3) the representations were made with the intent to deceive the creditor, (4) the creditor justifiably relied on the representations, and (5) the creditor's loss was the proximate result of the misrepresentations having been made." *First Deposit National Bank v. Gonzales,* 187 B.R. 183, 186 (Bankr.N.D.Ohio 1995); *Coman v. Phillips (In re Phillips),* 804 F.2d 930, 932 (6th Cir. 1986); *See Manufacturer's Hanover Trust Company v. Ward(In re Ward),* 857 F.2d 1082(6th Cir.1988). To except a debt from discharge under 11 U.S.C. § 523(a)(2)(A) the plaintiff must prove all of the above elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 290, 111 S.Ct. 654, 661, 112 L.Ed.2d 755(1991). Most recently, the Supreme Court interpreted 11 U.S.C. § 523(a)(2)(A) in *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Although the facts in *Field* did not involve a credit card account, its interpretation of § 523(a)(2)(A) recognizes that the use of the common law phrases "false pretenses, false representation or actual fraud" in § 523(a)(2)(A) incorporates the common law elements of those common law torts. *Id.* at —— – ——, 116 S.Ct. at 445–46.

Prior to *Field,* particularly in cases involving the use of a credit card, some courts focused predominantly on one of the five elements over another. As a result, three different approaches to the application of 11 U.S.C. § 523(a)(2)(A) to credit card debts developed.[9] They were (1) the implied misrepresentation approach;[10] (2) the assumption of risk/and reliance approach;[11] and (3) the actual fraud approach.[12]

---

**7.** The Debtor's testimony on this point was credible. Her presentation at trial was consistent with that of a person wholly unschooled and unsophisticated on matters of personal finance. Although a more sophisticated individual might have understood her impossible financial circumstances, the debtor did not then appear to comprehend her status nor to be planning a "bankruptcy escape."

**8.** In his opening statement counsel for plaintiff stated that the debtor opened her account with the plaintiff in 1993. However, no testimony was ever given on this subject.

**9.** Steven H. Resnicoff, *Dischargeability in Bankruptcy of Debts Incurred by "Purported Purchasers,"* 64 St. John's L.Rev. 253, 266 (Winter 1990).

**10.** *FCC National Bank/First Card v. Friend (In re Friend),* 156 B.R. 257 (Bankr.W.D.Mo.1993); *Citicorp Credit Services, Inc. v. Hinman (In re Hinman),* 120 B.R. 1018 (Bankr.D.N.D.1990); *Household Card Services/Visa v. Vermillion (In re Vermillion),* 136 B.R. 225 (Bankr.W.D.Mo.1992).

**11.** *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983).

**12.** *Chase Manhattan Bank v. Carpenter (In re Carpenter),* 53 B.R. 724 (Bankr.N.D.Ga.1985); *AT&T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr.N.D.Ill.1996); *GM Card v. Cox (In re Cox)* 182 B.R. 626 (Bankr.D.Mass. 1995).

The Sixth Circuit has followed a modified version of the reliance test.[13] "[E]ven if each credit card charge constituted a 'representation' of ability to pay, the case law and legislative history make it clear that a credit check must be conducted at some point; otherwise an exception to discharge is unavailable." *Ward*, 857 F.2d at 1085. The discussion in *Field* of the type of reliance that a creditor must prove to invoke § 523(a)(2)(A) validates the approach that has been followed in the Sixth Circuit since *Phillips*[14] and *Ward*. In the majority opinion, Justice Souter observed,

> As for the reasonableness of the reliance, our reading of the Act does not leave reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact. Naifs may recover, at common law and in bankruptcy, but lots of creditors are not at all naive. The subjectiveness of justifiability cuts both ways, and the reasonableness goes to the probability of actual reliance. —— U.S. at ——, 116 S.Ct. at 446.

Thus, this case presents the question of whether the benefit of 11 U.S.C. § 523(a)(2)(A) is available to a creditor that has failed to present evidence of at least a minimal credit investigation before issuing the card.

## A. FIRST REQUIREMENT: The Debtor Made a Representation

The representations arising from the debtor's use of her credit cards, if any, are far from clear. Some courts have held that a debtor's use of credit cards to make purchases and take cash advances gives rise to the implied representations of an ability and intention to pay for the charge incurred. *The May Company v. Chech (In re Chech)*, 96 B.R. 781, 783(Bankr.N.D.Ohio 1988). In

contrast, some courts have refused to imply any representation from credit card use. *Citibank South Dakota v. Dougherty (In re Dougherty)*, 84 B.R. 653, 656 (9th Cir. BAP 1988); *AT&T Universal Card v. Alvi (In re Alvi)*, 191 B.R. 724, 731 (Bankr.N.D.Ill.1996); *J.C. Penney Co. v. Shanahan (In re Shanahan)*, 151 B.R. 44, 47 (Bankr.W.D.N.Y.1993). And some courts have found an implied representation that the debtor has the intent to pay based on the debtor's credit card use. *Lippert*, 206 B.R. at 139; *Anastas v. American Savings Bank*, 94 F.3d 1280 (9th Cir. 1996).

■ Although the very phrase "implied representation" has an oxymoronic quality, the reality of modern commercial transactions is that they are often faceless interactions that are imbued with certain assumptions. Rather than hold broadly that representations cannot arise from a course of conduct, this Court is inclined to follow the well reasoned approach of the court in *In re Lippert* and imply only the representation that the debtor had the intent to pay based on her credit card use.

■ The testimony reveals that the debtor honestly intended to pay for her purchases, albeit by making the minimum monthly payments until her balance was paid in full. Although a person with more financial acumen may have realized the futility of the debtor's enterprise, the debtor did not understand her course of action to be unrealistic or futile. Thus, the appropriate representation to be implied from the debtor's use of her Keybank card is that the debtor intended to pay for her purchases over time.

However, even if a representation is implied from the debtor's use of her credit card, the creditor must still prove that the representation was made knowingly and falsely and with the intent to deceive the creditor.

---

**13.** The assumption of the risk and reliance approaches originate with the Eleventh Circuit's decision in *First National Bank v. Roddenberry*, 701 F.2d 927 (1983). However, the majority of courts addressing this issue have not chosen to follow this approach. Thus, in a situation where a creditor has done minimal investigation prior to issuing the credit card, the Sixth Circuit may be more inclined to follow an approach other than the assumption of the risk and reliance

approach. *In re Lippert*, 206 B.R. 136, 139. However, the Court does not need to address this issue further, as the creditor failed to present any evidence relating to its credit checking activities prior to extending a credit card with a limit of $8,000 to the debtor.

**14.** Cited with approval in *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 442, 133 L.Ed.2d 351 (1995).

*Field v. Mans,* —— U.S. ——, 116 S.Ct. 437; *In re Ward,* 857 F.2d 1082; *In re Phillips,* 804 F.2d 930.

### B. SECOND AND THIRD REQUIREMENTS: The Debtor Knew Such Representations To Be False At The Time They Were Made And The Representations Were Made With The Intent To Deceive The Creditor.

■■ These two elements of 11 U.S.C. § 523(a)(2)(A) must be proven to except a debt from discharge. In evaluating these two factors courts look at whether the debtor could have realistically expected to pay the charges incurred *and* whether she, in fact, intended to do so. *Huntington National Bank v. Lippert (In re Lippert),* 206 B.R. 136, 139 (Bankr.N.D.Ohio 1997). Although the fact that the debtor could not objectively have expected to be able to pay the charges may help support an inference of fraud, that fact alone is inconclusive. In addition, the plaintiff must prove that the debtor affirmatively acted with fraudulent intent.

■■ The fraudulent intent required to be proven is the debtor's actual intent which cannot be inferred solely from a debtor's insolvency, unemployment, or financial condition, but must be ascertained from all the relevant facts and circumstances. *Lippert,* 206 B.R. at 139, 140. Several courts have suggested various factors to be used in determining the debtor's state of mind and intent at the time the transaction took place.[15] The distinction is between two types of debtors: (1) the type that deliberately act, "load uppers", and (2) those that think they can keep the boat afloat. In this case there was simply no evidence that the debtor was deliberately "loading up" or trying to have a last hurrah at the creditor's expense. The absence of any evidence that this debtor was acting with the purpose of deceiving this creditor requires a finding that there has been a failure of proof on this most critical issue. *See Lippert,* 206 B.R. at 141; and *American Express Travel Related Services*

*Company, Inc. v. Hashemi,* 104 F.3d 1122, 1124 (9th Cir.1997); and *Anastas v. American Savings Bank,* 94 F.3d 1280 (9th Cir. 1996). The evidence before the Court does not show that the debtor was deviously attempting to have one last hurrah at her creditors' expense, but rather that she was trying to pay her creditors over the course of time by making the required minimum monthly payments.

The debtor thought she could continue to keep her head above water financially, particularly with help from her father and continued payments of the bills by the people who used her cards, e.g., the daughter, the mysterious man buying lumber and supplies.

> "A credit card ... embodies a continuing invitation by the issuer to the cardholder to make purchases or take advances from funds loaned to him by the issuer. There is nothing illegal or improper about the cardholder accepting the invitation to tide himself over a period of adversity ..." *Lippert,* 206 B.R. at 141.

In fact, "such behavior without evidence of 'loading up' or other behavior evidencing an intent not to pay the debt incurred should not constitute fraud under section 523(a)(2)(A)." *Lippert,* 206 B.R. at 142. The plaintiff presented no evidence that the debtor was "loading up" or otherwise attempting to have one last hurrah. Rather the record evidence is quite to the contrary. However objectively unrealistic her belief that she could continue to make ends meet was by making only the minimum monthly payments, the debtor honestly held that belief and that does not rise to the required level of intent to deceive. *See In re Briese,* 196 B.R. 440. The creditor failed to prove that the debtor acted with fraudulent intent such that her debt should be found nondischargeable.

### C. FOURTH REQUIREMENT: Reliance

■ The creditor must prove that the creditor justifiably relied on the debtor's representation and that doing so caused the creditor loss. *Field,* —— U.S. ——, ——, 116

---

**15.** Those factors are: the length of time between the charges made and the filing of bankruptcy; whether or not an attorney had been consulted concerning the filing of a bankruptcy before the charges were made; the number of charges made; the amount of charges; the financial condition of the debtor at the time the charges are made; and whether the charges were above the credit limit of the account. *In re Gonzales,* 187 B.R. 183, 187.

S.Ct. 437, 447, 133 L.Ed.2d 351 (1995). The Sixth Circuit held that a lender shows reliance by having, at a minimum, evaluated the creditworthiness of the debtor and ordinary credit information about the debtor prior to extending credit. *In re Ward*, 857 F.2d at 1085–86. In the absence of at least this minimum evidence of reliance, plaintiff cannot possibly prove his claim under 11 U.S.C. § 523(a)(2)(A). *Kinsler v. Pauley (In re Pauley)*, 205 B.R. 501, 512 (Bankr.W.D.Mich. 1997); *In re Alvi*, 191 B.R. 724 at 731. This Court's record contains no information on the underwriting activities performed by plaintiff prior to extending an $8,000 credit line to an individual whose gross annual income was approximately $12,000. The plaintiff had the burden of proof on the issue of reliance and failed to meet it.

## D. FIFTH REQUIREMENT: Causation

Since three of the first four requirements have not been proven in this case, discussing causation of this creditor's loss and damage is not required. The extension of an $8,000 line of credit to an individual with the Debtor's financial characteristics seems to be the cause of the plaintiff's loss. The absence of any evidence with respect to plaintiff's credit extension policies prevents the Court from expressly so finding, but there do appear to be significant gaps in the plaintiff's underwriting practices as compared to sound practices in that arena. It is not the purpose nor the function of § 523(a)(2)(A) to fill in such gaps after the fact, particularly not on the record currently before the Court.

## V. CONCLUSION

The plaintiff has failed to prove by a preponderance of the evidence the elements necessary to a determination that the debtor's course of conduct during the 25 day period in question was a "false pretense, a false representation, or actual fraud." Plaintiff's claim seeking to except this credit card debt from discharge under 11 U.S.C. § 523(a)(2)(A) is denied.

**IT IS SO ORDERED.**